## KEELY et ux. v. CARPENTER.
### No. 2499.

Court of Civil Appeals of Texas. Beaumont.
Jan. 17, 1934.

Rehearing Denied Jan. 24, 1934.

A. M. Huffman, of Beaumont, for appellants.

C. A. Lord and R. E. Masterson, both of Beaumont, for appellee.

WALKER, Chief Justice.

In the court below appellants, William Keely and his wife, Mrs. Emma Keely, were plaintiffs and appellee, F. H. Carpenter, was defendant. This suit was brought to cancel an instrument, in form an absolute deed, executed by appellants to appellee, on allegations that the instrument, though in form a deed, was in fact a mortgage, and the property conveyed was the homestead of appellants at the time the instrument was executed. The following quotation from the petition accurately reflects the nature of the cause of action.

"Plaintiffs would further say to the court that on the 3rd day of August, 1928, they executed a certain written instrument in the form of a deed and which purported to convey to defendant certain land, premises and improvements located in the City of Beaumont, Jefferson County, Texas, and described by metes and bounds as follows:

" 'Two lots located in the Ogden Addition to the City of Beaumont, Texas, each lot in size 50 ft. North and South and 150 ft. East and West located on the corner of Orange and Craig Sts. and facing same 150 ft. and lying East of Orange Street and facing same 100 feet, together with the improvements situated thereon consisting of a six room modern house and garage; said property being known as the Wm. Keely home.'

"That said deed recites a consideration of Eight Thousand ($8,000.00) Dollars, as having been paid to plaintiffs therefor, but in truth and in fact no consideration was paid for the execution of said instrument, but that said instrument was executed by plaintiffs as a mortgage to be delivered to and held by defendant as security for the sum of Eight Thousand ($8,000.00) Dollars, that was being advanced by him to McCarley Mining Company, in which company the defendant was one of the principal owners and stockholders, and that said instrument above referred to was to be held by defendant pending the sale of certain shares of stock of said McCarley Mining Company, the proceeds of which sale were to be used first in reimbursing the said defendant for the $8,000.00 so advanced by him and the balance of said funds to be paid over to the

said McCarley Mining Company and that Fifty Thousand (50,000) shares of McCarley Mining Company stock were delivered to the defendant along with said deed.

"It was further understood by plaintiffs, at the time said deed was executed, that same would be cancelled and returned to them by defendant or a reconveyance of the property made to them as soon as defendant made a sale of said stock or a sufficient amount thereof to reimburse him for the money so advanced."

The trial was to a jury, and judgment was in favor of appellee upon an instructed verdict. By their assignments of error, appellants complain of the exclusion of certain testimony, and that the court erred in refusing to send the case to the jury. Appellee offered no testimony.

The facts were as follows, on the testimony offered by appellants: The property in controversy was their homestead on the date of the execution and delivery of the purported deed. On that date appellant William Keely was president of McCarley Mining Company of Lordsburg, N. M., of which appellee was also an officer and stockholder, and in which appellants had invested about $88,000 in money and appellee about $25,000. The company held its mining property under an option contract calling for payment of $300,-000, of which $25,000 was due on the date of the execution of the purported deed. Foster, the holder of the option, was willing to extend it upon the payment of $7,500. The company also owed pressing labor claims to the amount of $500. The company had no funds, and appellants had expended in the enterprise all their available personal funds. Miles Carpenter, brother of appellee, was also a stockholder and officer in the company, and by telephone arranged with appellee, who lived and was at that time in Sour Lake, Hardin county, Tex., to advance the company $8,000, which was expended by paying Mr. Foster $7,500, and labor claims to the amount of $500. For the $8,000 thus advanced, appellee received the deed in controversy, whereby appellants purported to convey to him their homestead and 50,000 shares of stock in the mining company. The stock was not delivered to appellee as an absolute sale, but only to be held and sold by him as the source for recoupment of his $8,-000. Appellants executed and delivered their deed to appellee as additional protection to him against loss in this advancement.

■ The transaction between appellants, appellee, and the mining company was a mere mortgage against both the stock and appellants' homestead. If the stock sold for enough to repay the entire $8,000, then it followed that appellee had no further right, title, claim, or interest in or to appellants' homestead. If, upon sale, the stock failed to bring the $8,000, but for the claim of homestead, appellee would have had the right in equity to subject appellants' property to the payment of the balance due. Appellee had no "title" to the property, but only a lien or right in equity to subject it to the repayment of his advancement.

What we have said conflicts in no way with the holding of our Supreme Court in Astugueville v. Loustaunau, 61 Tex. 233: "The existence of a debt to be secured is the very foundation on which a mortgage or other lien depends; when the one is not found the other cannot exist."

True, there was no debt from appellants to appellee, nor was it necessary for them to show a debt. But for the homestead character of their property they had the power to pledge it to secure appellee in his advancement to the company to the same extent that they could have pledged their personal liability.

But appellee says he held no debt against the mining company. In this he is in error. It may be that the transaction between appellee and the mining company was subject to the construction that he held no personal obligation against it for any balance that might remain after the sale of the stock, but that fact does not change the nature of the transaction. In its essential attributes the advancement was a debt which appellee had the right to have repaid to the extent of the "security" held by him for that purpose.

■ The evidence in this case raised the issue that Miles Carpenter was appellee's agent in this transaction. Thus appellant William Keely testified that Miles Carpenter in the transaction "was representing Mr. Frank Carpenter"; the deed was delivered by appellants to Miles Carpenter and through him to appellee, who had it duly recorded and is now claiming under it; the negotiations between the mining company, appellants, and appellee, which culminated in the advancement of the $8,000, was by telephone between appellee and his brother, Miles Carpenter; no word in the negotiations passed between appellants and appellee, but all the transaction was had between him and his brother; not only was appellants' deed delivered to appellee through the agency of Miles Carpenter, but he was also delivered, through the same agency, the 50,000 shares of the mining company stock. From this conclusion it follows that all conversations between appellants and Miles Carpenter, leading up to the execution of the instrument in controversy, were admissible.

■■ On the theory that Miles Carpenter was the agent of appellee, the trial court committed error in the following respects: The court refused to permit C. A. Lutz, a witness tendered by appellants, to testify that he was present at the time the instrument in

controversy was executed and heard appellant Mrs. Keely state that she was executing the instrument to be used as a mortgage to secure the loan of $8,000 from appellee, Frank Carpenter, and that the loan was to be repaid with money obtained from the sale of 50,000 shares of McCarley Mining Company stock which was delivered to Miles Carpenter, along with the deed in controversy; and also refused to permit this witness to testify that, at the time the deed was executed and delivered to Miles Carpenter, Miles Carpenter stated that it was to serve as a mortgage to secure the loan of $8,000 made by appellee to the mining company. The court also refused to permit Arthur Keely to testify for appellants that he heard the conversations and negotiations between appellants, on the one hand, and Miles Carpenter, brother of appellee, on the other, and to facts that said deed or instrument was intended as a mortgage to secure a loan by appellee of $8,000. As this testimony was improperly excluded, we have given it due weight in determining that the court erred in instructing the verdict for appellee.

■ Independent of the issue of agency of Miles Carpenter, the excluded testimony was admissible. Davis v. Brewster, 59 Tex. 93, was a controversy by Davis and wife to establish as a mortgage a deed, absolute on its face, executed and delivered by them to the defendants. Speaking for the Supreme Court in support of his conclusion that the charge given by the lower court to the jury was error, Judge Stayton said: "The real question was: with what intent did Davis and wife execute the instrument, * * * and with what intent did the defendants receive it?" If Miles Carpenter was not the agent of appellee in the execution, delivery, and acceptance of the instrument in issue, then to make a case for the jury it was necessary for appellants to show (a) that they executed and delivered the instrument to appellee with the intent that it should have effect only as a mortgage, and (b) that appellee accepted it with the same intent; though absolute in form, if the mutual intent of the parties to the instrument in its execution and delivery was that it was to operate only as a mortgage, then, to quote from Davis v. Brewster, supra, "mortgage it is." The excluded testimony supported the contention of appellants that they intended the instrument to be only a mortgage, but on request of appellee it should be limited to that issue; and the following circumstances raised the issue against appellee that he accepted it with that intent on his part; thus the evidence would raise the necessary issues to take the case to the jury.

■ Appellee permitted appellants to occupy, use, and enjoy the property in controversy for about three years after the execution of the purported deed, without ever demanding possession, asking appellee to pay rent, or exercising any sort of dominion over it. After about three years without any additional compensation, appellee, at the request of appellant William Keely, agreed to convey the property back to appellants, but afterwards refused to do it; and, when the request was renewed by appellant Mrs. Keely, gave her the following excuse for not executing the deed:

"I asked him to release this and give me back this quitclaim deed, and he told me this, he says, 'I don't think I shall do that,' and I asked him why. We owed at that time and do today government income tax, and he said 'If I release this home Bill will sell it and pay the income tax that you people owe and you and the children will not have any home.' That is the reason that he gave me for not fixing the quitclaim deed and handing it to me that afternoon, and I told him at the time that he was not responsible for my family, never had been and never would be, and I got up and left him. When I started off, he asked me to come back, and I told him, 'no,' one time was enough, that probably the next time we met it would be in the courthouse, that the property had to be cleared up some time and I couldn't keep Dad holding off any longer. I asked him not to let this thing come into the courts, I didn't like for it to go in the courts; didn't like to be bothered with it.

"Q. During that conversation did you and Mr. Carpenter discuss that deed you executed in New Mexico? A. No. I just went and asked him to sign this deed, so I could clear my property up. I wanted to sell my property.

"Q. You say that was in 1931? A. That was in 1931, the summer of 1931. I don't exactly remember the date.

"Q. From the time this instrument was executed on August 3, 1928, up to the present time, has Mr. Carpenter ever demanded any possession of the place? A. No, sir."

The property, at the date of the execution of the instrument, was reasonably worth $16,000, while appellee advanced against the property and the 50,000 shares of mining stock only $8,000. In Loving v. Milliken, 59 Tex. 423, it was said: "When there is no defeasance expressly agreed upon, equity looks to all the circumstances preceding and attending the execution of the instrument, and sometimes to those which have subsequently occurred."

In that case the following circumstances in evidence here were mentioned as being evidentiary upon the issue of the character of the instrument: (a) The need for money, (b) sale for less than the value of the property, (c) no change in possession of the property, and the additional circumstance, (d) a statement of willingness by appellee to reconvey

the property by quitclaim deed. In Devlin on Deeds (2d Ed.) vol. 3, p. 1654, it is said: "If the vendor remains in possession of the property after the alleged sale, this is a circumstance that tends to show that it was not really a sale but a mortgage for such continuing possession in the vendor, after a sale, if not inconsistent with the sale, is an unusual accompaniment of it."

In L. R. A. 1916B, page 284, heading "Circumstances Constituting Indicia of Mortgage" it is said: "Does possession remain with the maker of the conveyance? This circumstance repels the idea of a sale; for the vendee in case of a sale would take possession."

In Gibbs v. Penny, 43 Tex. 563, it was said: "In this case, if we regard the object of the parties, it does not appear to have been a sale. If we look to the surrounding circumstances, the inadequacy of the price, and the necessitous circumstances of Penny, coupled with the fact of his renting the place for the current year as his own, they add force to more direct evidence of intention."

It follows that the judgment of the lower court should be reversed and remanded for new trial, and it is accordingly so ordered.